Robert T. BARBER

v.

Joseph T. EDGAR, Secretary of the State of Maine and Rosaire Martel.

Supreme Judicial Court of Maine.

Sept. 6, 1972.

**454**

Berman, Berman & Simmons, P. A. by Jack H. Simmons, Lewiston, for plaintiff.

Charles R. Larouche, Asst. Atty. Gen., Augusta, for Joseph T. Edgar.

Marshall, Raymond & Beliveau by Laurier T. Raymond, Jr., Lewiston, for Rosaire Martel.

Before WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

This Complaint seeking Declaratory Judgment is brought pursuant to the provisions of 14 M.R.S.A. §§ 5951–5963. It is before us on report. On the Complaint and Answer we are to render such decision as the rights of the parties require.

The Answer admits all the allegations of fact in the Complaint. It is thus established that Plaintiff Robert Barber was a duly qualfied candidate for nomination for the office of Sheriff of Androscoggin County in the Democratic Primary Election, June 19, 1972.

When the polls opened on that day Robert W. Bonenfant and Emile Roy were likewise qualified candidates for nomination to that office.

At approximately 12 o'clock noon on June 19, 1972, after the polls had opened but prior to their closing, Robert Bonenfant died. After the polls had closed it was determined that candidate Bonenfant had 6,135 votes cast for him; that the Plaintiff Barber had 2,884 and that Roy had 2,691 votes cast for him.

Nothing contrary appearing in the Complaint or Answer, we bow to the presumption of regularity and assume for the purposes of this decision the appropriate procedures were followed for the tabulation of votes and announcing the totals as is provided by 21 M.R.S.A. § 924 and 21 M.R.S.A. § 1047,[1] and that reports required by 21 M.R.S.A. § 1091 [2] and the tabulation pro-

---

[1]. 21 M.R.S.A. § 924: The election officials shall count the ballots under the supervision of the warden, as soon as the polls are closed, except that if, in the opinion of the city or town clerk, the public interests will best be served, referendum ballots may be counted on the next day immediately following the election, provided such count is completed within 24 hours after the closing of the polls. If referendum ballots are counted subject to this exception, the city or town clerk shall have the responsibility for the security and safekeeping of such ballots until such time as the count has been completed.

    1. *Counted in public.* The ballots must be counted publicly so that those present may observe the proceedings.

    \*     \*     \*     \*     \*

    3. *Results declared.* As soon as the ballots are counted, the warden shall declare the results publicly at the voting place.

    21 M.R.S.A. § 1047: The following regulations outline the procedure for tabulating votes at an election in which voting machines are used:

    \*     \*     \*     \*     \*

    2. *Totals announced.* The warden shall announce the total for each candidate in the order shown on the ballot label, for each referendum question, and for each write-in candidate. As each total is read, it shall be recorded by an election clerk from a political party other than that of the warden.

[2]. 21 M.R.S.A. § 1091: Within 10 days after a general election, the registrar shall

vided by 21 M.R.S.A. § 1092 [3] were appropriately done.

The Complaint alleges and the Answer concedes that in accordance with 21 M.R.S.A. § 1094 the Governor and Council met on July 5, 1972, and reviewed the tabulation of the vote.

The Complaint further recites that on the 5th day of July, 1972, the Governor of the State issued a proclamation purporting to have been authorized and commanded by 21 M.R.S.A. § 1474,[4] proclaiming:

(a) That Robert Bonenfant was nominated in the Primary Election of June 19, 1972;

(b) That Robert Bonenfant had died, and

(c) That a vacancy exists for a candidate for election to the office of Sheriff.

The Governor by this proclamation then directed that the Androscoggin County Democratic Committee meet on July 20th to nominate a candidate for the office of Sheriff to be voted upon at the General Election to be held on Tuesday, the 7th of November, 1972. The proclamation then recited that a Certificate of the choice of said nominee was to be filed in the office of the Secretary of State forthwith.

This Petition for Declaratory Judgment initiated by Barber followed. It prayed for a Court adjudication

" . . . that Plaintiff was the duly nominated candidate of the Democratic Party for the office of Sheriff of Androscoggin County"

and for remedial relief that the Court

" . . . order the Secretary of State to place Plaintiff's name, and no other, on the ballot for the General Election as the said nominee of the Democratic Party."

In this case, therefore, the only issue raised for decision in appropriately justiciable form is whether the legal effect to be assigned to the outcome of a primary election actually held and the votes actually cast is that the plaintiff, Barber, was

" . . . the person who receive[d] a plurality of the votes cast for nomination to . . . office, if the number equals or exceeds the number of signatures needed to place his name on the primary ballot by petition"

—thereby allowing the plaintiff, Barber, to be regarded "as nominated" pursuant to the specification of 21 M.R.S.A. § 1093(1).

Recognizing that in factual reality the votes as actually cast by the electorate failed to give him the plurality required by 21 M.R.S.A. § 1093(1), plaintiff seeks to nullify entirely the legal effect of 6,135 ballots, of a total cast of 11,710, marked for another person, Robert W. Bonenfant, whose name appeared on the ballot and was thus offered to the voters during the course of the election as an ostensibly officially valid voting option; and in this manner plaintiff strives to have the 2,884 votes cast for him operate as the plurality requisite under 21 M.R.S.A. § 1093(1). The asserted ground for such total obliteration of the legal effectiveness of 6,135 votes cast is that the noontime death, while

send a report to the Secretary of State stating the number of voters in each voting district of the municipality at the close of the polls on election day. Within 10 days after a primary election, the registrar shall report the total number of voters in each voting district of the municipality and the number of voters enrolled in each political party in each voting district of the municipality at the close of the polls on election day.

3. 21 M.R.S.A. § 1092: Within 20 days after an election, the Secretary of State

shall tabulate the election returns and submit the tabulation to the Governor and Council.

4. 21 M.R.S.A. § 1474: If a person nominated for an office other than United States Senator, Representative to Congress or Governor at a regular primary election dies, withdraws or becomes disqualified before the general election, the Governor shall issue a proclamation as provided in section 1473, and the procedure outlined in section 1442 must be followed.

the primary election was in progress, of the person whose name was Robert W. Bonenfant for whom the 6,135 ballots had been marked suffices, *ipso facto*, to nullify absolutely all legal effectiveness of the total votes thus cast.[5]

The theory is that the death of a person renders him legally ineligible to be the recipient of an election certificate under 21 M.R.S.A. § 1095(1) and, therefore, ultimately, to take, or hold, the office involved.

The argument is untenable.

■ Ineligibility to take, or hold, an office is a subject matter separate from, and, therefore, incapable of being controllingly dispositive of, the independent question of the legal effect to be given to votes as they have been actually cast in an election duly held and completed in conformity with the legal requirements directing the appropriate conduct of elections.

■ This latter issue must be evaluated, and decided, on the basis of the unique public policy considerations which derive from governmental concern to respect the will of the electorate as it has been objectively manifested in votes which have been actually cast. These policy considerations dictate that the objective results of elections conducted to actual completion, in accordance with legal directives prescribed for the procedural course of the election and the tabulation of its outcome, shall be accorded, rather than denied maximum possible legal effectiveness—so long as a Court may allow such legal effectiveness on a rational basis consistent with the realities of general experience and avoiding speculation concerning the subjective intentions of those who voted.

■ It is in light of this public policy that the overwhelming weight of authority in the United States has developed the principle that a person's ineligibility to take, or hold, office will not be permitted to vitiate absolutely and totally the legal effectiveness of the votes actually cast for him in a lawfully conducted election.

Such votes, as was said in Heald v. Payson, 110 Me. 204, 85 A. 576 (1913):

" . . . are at least so far effectual as to prevent the election of a candidate who received a less number of votes." (p. 206, 85 A. p. 576)

In Patton v. Haselton, 164 Iowa 645, 146 N.W. 477 (1914) the Court recognized as "quite uniformly held" (p. 478) the principle that should there be a majority vote for a candidate who might become ineligible to hold office before the election is completed

" . . . such majority vote is effective as an expression of the will of the voters, . . . sufficient to negative a claim of election as against the minority candidate." (p. 479)

The Iowa Court stressed the irrationality, because of the high degree of conjecture and speculation involved, of any legal presumption that a voter, even if he knowingly votes for an ineligible candidate, intends

5. Plaintiff is forced to such "all or nothing" position since it is manifest that in the present circumstances only speculation is possible concerning the actual subjective state of mind of any voter at the time he cast his vote, e. g. whether he was voting with or without actual knowledge that Robert W. Bonenfant had already died and whether, if he had such knowledge, what his purpose might have been in continuing to mark his ballot in favor of the deceased person.

Further, there is no evidence in the case as to the number of persons who might have cast their ballots before or after a reasonable range of time surrounding the noon hour when Mr. Bonenfant died and on the basis of which a possible cut-off time might be attempted to be established on any rationally sustainable basis.

that his vote should be entirely without legal effect—that he is deliberately throwing away his vote.

See: State ex rel. Sheets v. Speidel, 62 Ohio St. 156, 56 N.E. 871 (1900).

See the cases collected in the note in 133 A.L.R. 319 as an accurate reflection of the great preponderance of American authority in support of the general principle above stated.

The principle is further enunciated in Murtagh v. Registrar of Voters of Peabody, 340 Mass. 737, 166 N.E.2d 702 (1960), in a statement qualifying the reasoning of Madden v. Board of Election Com'rs., 251 Mass. 95, 146 N.E. 280 (1925), even as it was applied to the special circumstances in *Madden* which are significantly distinguishable from the specific situation now before us.

In *Murtagh* the Court said of some of the reasoning of *Madden*, that it

". . . is contrary to the great preponderance of American authority . . ."

and, further

". . . it fails to give proper weight to the negative value of a vote for the dead man. " (166 N.E.2d p. 704)

On the facts established before us the conclusion is inescapable that there were 11,710 valid votes cast for the office of Sheriff of Androscoggin County at the June 19, 1972, Primary Election. Plaintiff Barber failed to receive a plurality of these votes. His claim that he was elected must fail.

We declare that, plaintiff, Robert Barber, was not the duly nominated candidate of the Democratic Party for the office of Sheriff of Androscoggin County at the June 19, 1972, Primary Election.

Accordingly, other prayers of the Complaint are denied.

DUFRESNE, C. J., did not sit.